# RICHARD G. BOWMAN, M.D.
## DABPMR, DABPM, FIPP, CEDIR, CLCP
P.O. Box 32
Charleston, WV 25321
304-400-8641
rgbmedicalinc@gmail.com

**Physical Medicine and Disability
Rehabilitation Evaluation
Mr. Frank K. Miller
DOI: June 25, 2017**

Referred By:
Bailey Javins & Carter
L. Lee Javins II
213 Hale Street
Charleston, WV 25301



PLAINTIFF'S EXHIBIT B

*RGB Medical Inc.*
*Dr. Richard G. Bowman II*
*P.O. Box 32*
*Charleston, WV 25321*
*(304) 400-8641*

## Physical Medicine and Rehabilitation Disability Evaluation

**Claimant Name:** Frank K. Miller
**Date of birth:** 04/24/1965
**Social Security Number:** xxx-xx-2578
**Date of injury:** 06/25/17
**Date of interview:** 11/19/18
**Date of report:** 11/19/18

**Consent:**
    Mr. Frank K. Miller was evaluated at his home in Foster, WV regarding his injury. A Physical Medicine and Rehabilitation Disability Evaluation was performed for the purpose of developing a Life Care Plan. The context of the evaluation was explained to him. He understood this was a one-time evaluation and no care, advice or treatment was to be provided. He also understood no doctor-patient relationship would be established. He was informed a written report would be issued to his attorney. He understood the evaluator, Dr. Richard G. Bowman II, may be asked to provide information in court or directly to the requesting party.

**Accident History:**
    Mr. Miller reported on June 25, 2017, his 38-caliber cobra derringer he was carrying fell onto the floor. The handgun fired one round when it hit the floor. The round entered Mr. Miller's left lower extremity. It entered and exited the left calf and the left thigh. It entered the left abdomen. Boone County Ambulance Authority arrived at the home of Mr. Frank Miller for a gunshot wound to the left lower quadrant and left leg. The report indicated that the gunshot entered and exited several areas including the hamstring, groin area and abdomen. It noted that Mr. Miller complained of abdominal pain. He was reported to be alert and oriented. His vital signs were stable. There was minimal bleeding noted. Two peripheral IV's were established. He was given Fentanyl for pain. He was promptly transported via ambulance to the nearest Air Evac Lifeteam landing site on WV Route 3.
    The Air Evac Lifeteam team arrived at the landing site. Their documentation noted Mr. Miller was alert and oriented and had a full recall of the event. His vital signs were stable. He had a Glasgow Coma Scale of 15. Bullet wounds were noted to the left proximal-anterior-medial thigh. Wounds were also noted along the left distal thigh and along the left calf. No active bleeding was noted. He complained of, "severe, constant, and sharp" abdominal pain and left leg pain. He rated his pain as 9 out of 10. He was flown to Charleston Area Medical Center (CAMC) General Division.
    Upon arrival to CAMC General Emergency Room, trauma services evaluated Mr. Miller and noted a gunshot wound to the left medial calf, left medial and anterior thigh, and left lower quadrant. He had left sided abdominal tenderness with guarding and some rigidity throughout

the abdomen. He was hemodynamically stable. An exploratory laparotomy was recommended with a possible bowel resection and possible ostomy. Mr. Miller was reported to have given verbal consent and wished to proceed with the emergency surgery. A CT angiogram of the left lower extremity was performed to rule out any vascular injury. No definitive vascular injury was identified. An x-ray of the chest revealed bibasilar subsegmental atelectasis and a metallic foreign body in the left upper quadrant of the abdomen. An x-ray of the lumbosacral spine revealed no definite fracture or dislocation. Labs were drawn and reviewed.

On June 26, 2017, Dr. John Deluca performed an exploratory laparotomy with proximal jejunal resection and primary anastomosis of the jejunum with a stapler. Mobilization of the splenic flexure and segmental resection of colon with primary side to side antiperistaltic anastomosis was performed. He was transferred from the operating room to a surgical trauma intensive care unit (ICU) bed with a nasogastric tube and a Foley catheter. He was transfused with one unit of red blood cells. Antibiotics were recommended for seven days.

On June 27, 2017, Dr. Deluca evaluated Mr. Miller and noted the incision was clean, dry, and intact. Mr. Miller reported significant peri-incisional abdominal pain. Dr. Deluca noted a high anastomosis near the ligament of Treitz. The nasogastric tube was to be continued until there was return of bowel function. The Foley catheter was to be discontinued and Dr. Deluca recommended Mr. Miller be transferred to a step-down bed. A chest x-ray revealed no pneumothorax. Physical therapy (PT) and occupational therapy (OT) were consulted. A nutritional consultation was obtained. A left lower extremity duplex ultrasound revealed no arterial injury.

On June 28, 2017, Mr. Miller was transported from the stepdown unit to a regular bed. He continued to require a patient controlled analgesia (PCA) device for pain control. His Foley catheter was discontinued. On June 30, 2017, the nasogastric tube was removed. On July 3, 2017, Dr. Glenn Warden evaluated Mr. Miller and indicated that Mr. Miller was tolerating a regular diet. His abdomen was soft and non-distended. His incision was clean, dry, and intact. He was ambulating with a walker. Mr. Miller had not yet had a bowel movement. Dr. Warden noted Mr. Miller reported a typical bowel movement pattern of only one bowel movement every other week. Dr. Warden noted Mr. Miller suffered from a pre-injury history of irritable bowel syndrome (IBS) and Mr. Miller knew how to care for his IBS. Mr. Miller was discharged to home on July 3, 2017 with a walker, docusate sodium 100mg twice a day, and Percocet 5/325mg every four hours as needed for pain. He was to follow-up with the trauma surgery clinic in one to two weeks. CAMC discharge diagnoses included: a puncture wound without foreign body of abdominal wall, left lower quadrant with penetration into peritoneal cavity, puncture wound without foreign body to the left lower leg, irritable bowel syndrome without diarrhea, Type II diabetes mellitus, gastroesophageal reflux disease (GERD) without esophagitis, post-traumatic stress disorder, old myocardial infarction, and acute post hemorrhagic anemia.

On July 12, 2017, Mr. Miller attended a follow-up visit at the CAMC General Surgery Clinic with Dr. Justin Chuang. A prescription was given for Percocet 5/325 every four hours for pain. A work release (FMLA) from July 12, 2017 to August 1, 2017 was given to Mr. Miller's wife so she could stay home and assist with his care. On July 19, 2017, Mr. Miller attended a

follow-up visit at the CAMC General Surgery Clinic with Dr. Warden. It was noted Mr. Miller's incision was healing well. He was given permission to shower. He was ordered to avoid lifting greater than ten pounds for four weeks. Mr. Miller was to follow-up at the surgery clinic in four weeks.

On August 10, 2017, a report was generated regarding the recent chest x-ray. It revealed the bullet in the left posterior superior abdomen. On August 21, 2017, he was evaluated at the VA hospital for an exercise stress test. Records revealed he was unable to walk on the treadmill due to a recent gunshot wound and major surgery. A chemical stress test was recommended.

On August 23, 2017, Mr. Miller attended a follow-up visit at the CAMC General Surgery Clinic with Dr. Deluca. It was noted Mr. Miller was supplementing his diet with Ensure. He complained of hard stools with straining. A 0.5cm area of the midline abdominal incision was noted to have occasional drainage. Docusate was recommended. On August 24, 2017, a cardiac stress test was scheduled with John Molly, M.D. but was not completed. On November 8, 2017, he saw Dr. Warden at the CAMC General Surgery Clinic for a follow-up visit for the midline abdominal wound drainage. He was noted to be afebrile. Silver Nitrate was applied to three stitch abscesses along the midline abdominal wound.

On December 07, 2017, Mr. Miller was evaluated by John Hutton, M.D. at Damous Psychological Services. A diagnosis was of post-traumatic stress disorder (PTSD) and major depressive disorder, recurrent without psychotic symptoms was documented. Dr. Hutton noted Mr. Miller was having nightmares do to the PTSD, anxiety, and depression. Savella 25mg once daily was prescribed for one week and then Mr. Miller was to increase the dose to twice daily.

On October 11, 2018, Nicole Willey, DO at the Department of Veteran Affairs composed a record noting the x-rays of Mr. Miller's chest and back showed the bullet fragment was still in place. The note also recorded that electromyogram results were pending. The electromyogram results would help to determine if a CT myelogram was needed.

**Chief Complaint/Present Symptoms:**

Mr. Miller complains of continued pain, reduced mobility, reduced strength, increased anxiety, loss of interest in activities, increased frequency of nightmares, and increased frequency of daily visual hallucinations. He complains of pain in the left posterior thorax along the palpable bullet. The thoracic pain is exacerbated with palpation, with left upper extremity shoulder motion, and with left upper extremity pushing and pulling. He complains of lower abdominal pain with upper extremity pushing or pulling such as when running the sweeper in his home. He complains of left thigh pain when standing up from a seated position or when bending down to sit or pick up an item. Mr. Miller finds that the left thigh pain contributes to his reduced mobility. He also complains of mild severity daily low back pain preceding the gunshot wound. This pain had been attributed to fibromyalgia in the records. This left low back pain is much more frequent and intense since he has become much less mobile following his gunshot wound requiring exploratory laparotomy. Mr. Miller attended an extensive physical therapy regimen. He reports results including modest improvements with mobility and leg strength, but he reports that he continued to suffer with chronic pain and disability despite physical therapy intervention. Mr. Miller continues to have pain sleeping on his left side. He was a previous left side or

stomach sleeper. The left thoracic bullet makes left side, abdominal, and back sleeping painful. Mr. Miller has purchased a new Sealy Posturepedic foam mattress that allows him to sleep on his right side.

    Mr. Miller continues to require a cane to stabilize his gait on uneven surfaces. He carries the cane in his right hand and uses it for balance, to assist him on stairs, and to assist him with sit to stand and stand to sit transfers. He continues to have a greatly reduced standing endurance and a reduced maximum walking distance compared to his capabilities prior to the gunshot wound. Mr. Miller continues to utilize a reacher device to pick up items from the floor because he cannot safely bend down and get back up without potentially falling. Mr. Miller remains unable to climb hills or ambulate on slippery or off-camber surfaces safely due to his left lower extremity weakness and his chronic pain. Mr. Miller can no longer effectively split, stack, and haul firewood to heat his home. While he can load the fireplace log by log if the logs are stacked neatly outside his door, he needs assistance with acquiring the firewood and having it stacked weekly along the back deck where he can feasibly access it piece by piece. Mr. Miller heats one-half his house with a wood fireplace and the other one-half of his home with gas heat.

    Mr. Miller continues to experience worsened symptoms of PTSD since the gunshot injury. He has vivid nightmares that involve him being shot. Mr. Miller also complains of daytime hallucinations. He recalls a little girl he helped in the war who was later killed. He has had visual hallucinations of during the daytime for several years. The frequency of these hallucinations has increased now compared to before he was shot. Mr. Miller finds that he is more anxious since his gunshot injury. He is more focused on theft and is concerned that his home may be robbed if he leaves his home and leaves his video security cameras unattended. Mr. Miller has a generalized lack of interest in hobbies and other activities he previously enjoyed. He has no interest in hunting or fishing. He was an avid outdoorsman before the gunshot wound. He has a handicap hunting license, but he no longer desires to go hunting. He used to hunt yearly in Lincoln County near Mud River Lake. He is not confident he could load and transport a deer even with the help of his UTV.

    Mr. Miller's overall ability to participate in activities that he previously enjoyed are greatly reduced. He was an avid Harley rider and had to sell his primary motorcycle because he could no longer balance the bike due to his left leg weakness. He also has a smaller Harley Sportster 883 that he can no longer ride because of his left leg weakness. He purchased a Harley Trike. He can still ride this motorcycle, but finds the trike less enjoyable than a two-wheeled bike. He has spent less time this season riding because of his reduced enthusiasm with riding a trike. Mr. Miller continues to attend his Veterans of Foreign Wars (VFW) meeting on Tuesdays and remains active in this group. He can no longer perform home remodeling or woodworking. His left leg weakness, left thorax pain with left upper extremity pushing and pulling, and reduced ability to lift and carry items make woodworking and remodeling prohibitive. Mr. Miller can no longer proficiently get up from the ground making routine engine maintenance impossible. He used to perform car and motorcycle maintenance regularly. His welding ability is also greatly limited due to reduced standing and lifting capacity. Mr. Miller can perform his overall routine activities of daily living but performs these activities much more slowly. Activities of daily living also require much more effort than prior to the gunshot wound.

Claimant Name: Frank K. Miller
Date of injury: 06/25/17
Page: 5

**Current Medications:**
Alprazolam 0.5mg, three pills at night
Allopurinol 300mg, once a day
Aspirin 81mg, once a day
Atenolol 25mg, one-half tablet daily
Carboxymethylcellulose Sodium 0.5%, one drop to both eyes four times a day
Clonidine .2mg at bedtime
Docusate Sodium 100mg, twice a day as needed
Duloxetine 60mg, once a day
Eluxadoline 100mg, once a day
Ferous Sulfate 325mg, three times a day
Fluocinonide cream 0.5% daily for skin rash
Lisinopril 2.5mg, once a day
Magnesium Oxide 400mg, once a day
Metformin 850mg, three times a day
Multi Vitamin, once a day
Naproxen 500mg, he uses approximately 1 pill a week
Nitroglycerin 0.4mg as needed for angina
Omega-3 (fish oil)
Pantoprazole 40mg, once a day
Prazosin 2mg, every night
Simvastatin 40mg, one-half tablet every day
Zonisamide 100mg, at bedtime
Zonisamide 50mg, three times a day
Vitamin D3 1,000u, once a day

**Allergies:**
Cyclobenzaprine Hydrochloride, Etodolac, Methocarbamol, Percogesic, Pravastatin Sodium, Salsalate

**Social History:**
Residence history: He has lived for 21 years on Route 3 in Boone County. He lives in a three-bedroom rancher with a crawl space on a 1.99-acre tract. He cuts his yard with a riding lawn mower. He must have someone else trim the yard since his injuries. Trimming the yard takes about 30 minutes. He must now have someone perform snow removal. He has a manually propelled snow blower he can no longer operate. He has a snow blade for his mower but the mower cannot ascend his steep driveway.
Marriage history: He had been married for 33 years. He has two children ages 26 and 22.
Pursuit of everyday living: After high school, he entered the military in 1986 at age 21 after performing several odd jobs. He served in the Army through 1992. He was in the National Guard four years. He worked for Brown and Root for 1 year. He worked for the Post Office from 1993 to 2005 (he was terminated for impaired judgment and impaired reactivity related to

his PTSD). He worked for Massey Energy in 2006 as a coal miner, then as a welder through 2011. In 2011, he became permanently disabled due to PTSD.
Tobacco history: He rubs 1 can every 2.5 days, since age 10.
Alcohol history: He drinks an occasional beer.
Drug history: None

**Education:**
He is a high school graduate

**Past Medical History:**
(Pre-injury) Anxiety, Depression, Diabetes, Hypertension, Myocardial infarction and cardiac stent, Post-Traumatic Stress Disorder (PTSD), Gout, IBS, Diabetic neuropathy, Tinnitus, Chronic pain, Sleep apnea, Chronic fatigue, Fibromyalgia, Hypercholesterolemia, GERD, and Chronic renal failure

**Past Surgical History:**
Pre-injury: Cardiac stents and left thumb laceration with suturing
Post-injury: June 26, 2017 exploratory laparotomy, proximal jejunal resection with primary anastomosis of jejunum with stapler, mobilization of splenic flexure, and segmental resection of colon with primary side to side antiperistaltic anastomosis.

**Family Medical History:**
Maternal: Fibromyalgia
Paternal: Diabetes

**Medical Records Received:**
Air Evac Lifeteam
Boone County Ambulance Authority
CAMC
Department of Veterans Affairs
Filed Complaint
John P. Hutton, M.D. at Damous Psychological Services
Plaintiff's Responses to Defendant

**Medical Billing Received and Reviewed:**
Associated Radiologists, Inc.
Boone County Ambulance Authority
Boone Memorial Hospital, Inc.
CAMC
Department of Veteran Affairs
General Anesthesia Services, Inc.

Claimant Name: Frank K. Miller
Date of injury: 06/25/17
Page: 7

**Review of Systems:**

**HEENT:**
No change in hearing or vision
Corrective lenses
No recent neck pain exacerbations

**Respiratory:**
No shortness of breath

**Cardiac:**
No chest pain, pressure or cardiac events recently

**GI:**
No changes in baseline bowel status

**GU:**
No changes in bladder status

**ID:**
No fever or chills

**Physical Exam:**

**General:**
Height: 5'10"
Well developed, well nourished
Alert and oriented to person, place, time and situation
Slightly flattened affect
No evidence of discomfort or distress at rest

**HEENT:**
Cranial motor function normal bilaterally
Bilateral hearing aids
Normal facial symmetry
Normal bilateral extra ocular movements
No sensory deficits of the face
No anterior cervical tenderness
No lateral cervical tenderness
No posterior cervical tenderness

Claimant Name: Frank K. Miller
Date of injury: 06/25/17
Page: 8

**Upper Extremity Exam:**
General:
No amputations
Normal size and symmetry of the upper extremities

Range of motion:
Shoulder range of motion right normal
Shoulder range of motion deficits left:
Abduction: 76 degrees
Adduction: 30 degrees
Flexion: 108 degrees
Extension: 36 degrees
No elbow range of motion deficits right or left
No wrist range of motion deficits right or left
No hand or finger range of motion deficits right or left

Sensory:
Sensory exam of the upper extremity reveals normal light touch and pinprick throughout the upper extremities.

Tenderness:
No tenderness to palpation throughout the upper right or left extremities.

Handedness:
He is ambidextrous; mainly right-handed

Motor Exam:
Right Upper Extremity:

| | |
|---|---|
| Right grip (pounds) | 76 (maximum of 3) |
| Wrist Extension | 5/5 |
| Wrist Flexion | 5/5 |
| Wrist Pronation | 5/5 |
| Wrist Supination | 5/5 |
| Elbow Extension | 5/5 |
| Elbow Flexion | 5/5 |
| Shoulder Extension | 5/5 |
| Shoulder Flexion | 5/5 |
| Shoulder Abduction | 5/5 |
| Shoulder Adduction | 5/5 |
| Shoulder Internal Rotation | 5/5 |
| Shoulder External Rotation | 5/5 |

Left Upper Extremity:
Pain inhibition weakness along the left thorax bullet location with LUE strength testing

| | |
|---|---|
| Left grip (pounds) | 64 (maximum of 3) |
| Wrist Extension | 5/5 |
| Wrist Flexion | 5/5 |
| Wrist Pronation | 5/5 |
| Wrist Supination | 4+/5 |
| Elbow Extension | 5/5 |
| Elbow Flexion | 4/5 |
| Shoulder Extension | 4/5 |
| Shoulder Flexion | 4/5 |
| Shoulder Abduction | 4-/5 |
| Shoulder Adduction | 4/5 |
| Shoulder Internal Rotation | 4/5 |
| Shoulder External Rotation | 4/5 |

Upper Extremity Reflexes:
Right:
2 Biceps
2 Brachioradialis
Left:
2 Biceps
2 Brachioradialis

Pulses:
Normal palpable pulse right radial
Normal palpable pulse left radial

Skin:
The skin is intact in the upper extremities. The temperature to touch is proportional right and left. No palpable hot or cold areas of the upper extremities. No skin mottling or erythema noted.

**Thoracic Spine:**
No significant scoliosis or kyphosis
Positive palpable metal fragment in the left posterior-lateral thorax. This is located 23cm superior to the left posterior superior iliac spine.
No thoracic muscular atrophy observed
No thoracic sensory deficits

**Chest Exam:**
No observed chest wall deformities or asymmetry
Normal observed chest wall movement right and left with inspiration and expiration

**Abdominal Exam:**
General:
There is a 29cm midline scar that crosses right of the umbilicus; there is an indentation 3cm below the umbilicus.
Midline tenderness of the lower quadrants below the umbilicus noted
No hepatosplenomegaly
No ascites observed
No rebound tenderness
No guarding
Mild abdominal obesity

**Lumbar Exam:**
General:
No significant scoliosis or kyphosis

Tenderness:
24 degrees of maximum lumbar flexion without pain
13 degrees of maximum lumbar extension with left lower lumbar pain
06 degrees of left lateral lumbar bending with left lower lumbar pain
12 degrees of right lateral lumbar bending without pain

**Lower Extremity Exam:**
General:
Normal leg length observed

Scarring:
There is a 2cm length left medial calf scar and a 0.5cm left lateral calf scar.
There is a 3cm length distal lateral thigh scar and a 1cm length proximal medial thigh scar.
The left lower extremity scars were all non-tender.
The left thigh revealed pain with quadriceps or hamstring contraction and co-contraction.

Circumferences:
Right:
Above knee 50cm
Below knee 36cm
Left:
Above knee 49cm
Below knee 36cm

Sensory:
Normal

Tenderness:
None in the lower extremities

Motor Exam:
Left Lower Extremity:
| | |
|---|---|
| Hip Extension | 4/5 with pain medial thigh |
| Hip Flexion | 4/5 with pain medial thigh |
| Leg Extension | 4+/5 |
| Leg Flexion | 4/5 with pain medial thigh |
| Dorsiflexion | 4+/5 |
| Plantar Flexion | 5/5 |

Right Lower Extremity:
| | |
|---|---|
| Hip Extension | 5/5 |
| Hip Flexion | 5/5 |
| Leg Extension | 5/5 |
| Leg Flexion | 5/5 |
| Dorsiflexion | 5/5 |
| Plantar Flexion | 5/5 |

Seated straight leg raise left negative
Seated straight leg raise right negative

Functional Testing:
Partial squat to a maximum of 64 degrees knee flexion performed with leaning to the right
The partial squat caused medial left thigh pain
Pain noted with transferring from sit to stand from a chair
Patrick's Test was performed and was negative on the right; on the left it was negative for sacroiliac pain but did cause left medial thigh pain
He can do a bilateral toe-raise
He can do a single toe-raise on the right but not on the left
He can do a bilateral heel raise
He has left low back pain induced with lumbar flexion plus combined rotation to the left or to the right
Lower abdominal pain is reproduced when he must stabilize his core on exam with simulated left upper extremity pushing and pulling
He was observed ambulating on a level surface indoors without a cane but he has fair balance only when not using his cane or when his balance is challenged on exam while standing and while walking.

Claimant Name: Frank K. Miller
Date of injury: 06/25/17
Page: 12

Lower Extremity Reflexes:
Right:
2 patellar
2 Achilles
Left:
2 patellar
2 Achilles

Pulses:
Normal palpable pulse dorsalis pedis right
Normal palpable pulse dorsalis pedis left
Normal palpable pulse tibialis posterior right
Normal palpable pulse tibialis posterior left

Skin:
The skin is intact in the lower extremities. The temperature to touch is proportional right and left. He does not have any palpable hot or cold areas of the lower extremities. No skin mottling or erythema noted on exam.

**Assessments:**
1. **Status post gunshot injury June 25, 2017**
2. **Status post exploratory laparotomy June 25, 2017 due to injuries caused by the gunshot injury**
3. **Ongoing loss of core strength due to the large abdominal incision through the abdominal muscles due to the June 26, 2017 exploratory laparotomy**
4. **Ongoing pain from the residual bullet fragment in the thorax from the gunshot injury June 25, 2017**
5. **Ongoing pain inhibition weakness of the upper extremity due to the June 25, 2017 gunshot injury**
6. **Ongoing weakness of the upper extremity contributed to by weakness of the core caused by the June 25, 2017 gunshot injury**
7. **Ongoing left lower leg pain and weakness due to the June 25, 2017 gunshot injury**
8. **Ongoing left upper leg pain and weakness due to the June 25, 2017 gunshot injury**
9. **Ongoing balance deficits due to lower extremity weakness with disability caused by the June 25, 2017 gunshot injury**
10. **Ongoing deconditioning, reduced gait, and reduced transfer capabilities due to the June 25, 2017 gunshot injury**
11. **Ongoing PTSD exacerbation caused by the June 25, 2017 gunshot injury**

Claimant Name: Frank K. Miller
Date of injury: 06/25/17
Page: 13

Recommendations:
1. Mr. Miller is no longer able to perform essential household duties due to his disabilities caused by the gunshot injury. Mr. Miller should anticipate an accelerated rate of degenerative decline caused by sequelae of the gunshot injury. His need for assistance in his home will increase with time. While assistive devices, physical therapy, and a home exercise program will minimize his accelerated rate of degenerative decline, his relatively reduced physical activity compounded with reduced core strength caused by his abdominal surgery will result in progressively worsening gait, transfers, and lumbar pain. He should acquire assistance currently with all lifting exceeding 20 pounds and all lifting while bending forward. He must lift when ambulatory with only one hand. It is not safe for him to ambulate inside or outside the home without his cane due to his lower extremity weakness, core weakness, and reduced balance. He should currently receive in-home cleaning services, in-home heavy cooking and meal preparation services, and laundry services. This will require weekly cleaning services for the next 28 years. He may feasibly contract these services through a locally licensed cleaning service. He will also require approximately five hours per week of in-home non-nursing assistance currently (20 hours per month average). To feasibly obtain reliable service for these essential needs, he should contract with a comprehensive home health service to provide staff to perform these non-nursing duties. By age 65, he will require the equivalent of two hours per day of in-home non-nursing assistance to perform duties to also include laundry, weekly grocery shopping and delivery, heavy cooking and large meal preparation, sit to stand and stand to sit transfers at the bedside, bathing, and lower extremity dressing. These services will afford him safety with activities of daily living and household services. By age 75, his physical capabilities will have further declined and he will additionally require assistance with all cooking, all sit to stand and stand to sit transfers, all toileting, and all community transport to physician's visits, physical therapy, and social outings such as his weekly VFW meetings. His needs by age 75 will require approximately eight hours per day of in-home non-nursing assistance.
2. Mr. Miller should initiate treatment with a local physiatrist to evaluate and treat his chronic disabilities caused by his gunshot injury. His physiatrist can prescribe physical therapy, assistive devices, and medications to assist with chronic pain or inflammation from his injuries. He should anticipate seeing this physician for evaluation at least four times per year.
3. Mr. Miller shoulder undergo a regimen of physical therapy each year to maximize his lower extremity range of motion, strength, gait, balance, and transfers. This will help to minimize the accelerated rate of degenerative decline he will experience due to the injuries caused by the gunshot injury. He should anticipate participating in three sessions per week for eight weeks at least annually to assist him with mobility. Each therapy session should be completed with instructions for an updated home exercise program to be utilized between therapy regimens.

4. Mr. Miller has a current straight cane. This assistive device should be replaced at a minimum of three-year intervals due to normal wear and tear.
5. Mr. Miller will require the use of a rollator by age 65 due to his reduced mobility that will progressively worsen over time due to the accelerated rate of degenerative decline caused by his chronic disabilities incurred from the gunshot injury.
6. Mr. Miller will require the use of a power scooter by age 65 for utilization with long distance ambulation in the community including doctor's visits and VFW meetings due to his reduced mobility that will progressively worsen over time due to the accelerated rate of degenerative decline caused by his chronic disabilities incurred from the gunshot injury.
7. Mr. Miller will require a power scooter vehicle carrier by age 65 for use on a car or truck to transport a power scooter. The power scooter will be used for long distance ambulation in the community including doctor's visits and VFW meetings.
8. Mr. Miller will require ongoing treatment of his PTSD exacerbation caused by the gunshot injury. Over the next two years of continuous treatment, he will likely experience a reduction of PTSD symptoms and return to his pre-gunshot injury PTSD baseline. He will incur the costs associated with PTSD exacerbation treatment for at least two more years.
9. Mr. Miller should anticipate incurring the cost of continuing the use of psychotropic medications for treatment of his PTSD exacerbation over the next two years. He will likely experience a reduction of PTSD symptoms and return to his pre-gunshot injury PTSD baseline in approximately two years.
10. Mr. Miller should undergo structural modifications to his home to accommodate his disabilities. These modifications will afford him safe ingress and egress to and from his home and will provide him a safe bathroom environment for bathing and toileting. Mr. Miller's front porch is situated with a door facing the yard, but the door is oriented 90 degrees from the sidewalk. There is a 13-inch rise in elevation from the sidewalk to the front porch deck. The front porch deck is approximately 10 feet long and would need to be at least six feet wide to accommodate the wheelchair ramp entry, a landing area, and an area for the front door to open and close. There is an additional 5-inch elevation rise from the front porch deck to the front door threshold. Mr. Miller should have a safe wheelchair ramp with a slope not exceeding one inch per linear foot. The ramp is appropriate for use now. He is not stable with gait to safely avoid falls up or down stairs, based on direct observation ambulating with a cane at the time of the in-home evaluation. Accomplishing this task will require restructuring of the front porch deck surface and raising it 5 inches so that it is level with the front door threshold and construction of an 18-foot long wheelchair ramp with safety rails that extends down the length of the sidewalk from the restructured front porch. Mr. Miller has a rear deck and walkway to his garage side door. This rear deck has a one inch elevation loss to the deck that can be corrected with an extended threshold. A wheelchair ramp and walkway to the garage doorway at a recommended slope not exceeding

Claimant Name: Frank K. Miller
Date of injury: 06/25/17
Page: 15

    one inch per linear foot will require 20 feet of sloped ramp length. Because the distance between the rear door and the garage doorway is less than 20 feet, the wheelchair ramp will need to exit the rear deck from the left rear corner of the rear deck, extend to the left to a square landing, then extend left again towards the garage doorway. The sloped surface should end on a landing situated adjacent to and level with the garage doorway. Mr. Miller should have his master bathroom rebuilt to accommodate a handicap accessible roll-in shower with shower seat. This will provide him bathing safety. The shower should be situated in the location of his current tub and will encompass part of the location where his current shower is situated. A small separating wall will require removal. Resurfacing of the floors, resurfacing of the walls, repainting of the walls, relocation of the plumbing, and relocation of related electrical fixtures will be required. The toilet area and adjacent cabinetry should be reconfigured with the cabinet space relocated to provide more space surrounding the toilet. This will provide space for an elevated toilet with toilet safety rails. The toilet can be located so that it can be accessed with a rollator or wheelchair.

11. Mr. Miller should anticipate replacing his mattress after the cessation of the manufacturer's warranty at ten years so that he can continue sleeping in his modified sleeping position necessary because of the pain he experiences from his gunshot injuries.

*All of my opinions are based upon a reasonable degree of medical certainty taking into consideration my examination and all medical information provided. Should you have any further question, please do not hesitate to contact me through my office.*

*I state that I am a board-certified physician practicing in the State of WV and hereby affirm that the contents of this report are true to the best of my knowledge under the penalties of perjury.*

Date: 11/19/18     Signed: _Richard G. Bowman II, MD_
                                      Dr. Richard G. Bowman II
                                 DABPMR, DABPM, FIPP, CEDIR, CLCP