IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

FRANK KENNETH MILLER, JR.,

        Plaintiff,

v.                                      CIVIL ACTION NO. 2:18-cv-00269

BEARMAN INDUSTRIES, LLC,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Bearman Industries, LLC's ("Defendant") Renewed Motion to Dismiss. (ECF No. 138.) For the reasons more fully explained below, the motion is **GRANTED**.

*I.    BACKGROUND*

This matter arises from a products liability case and the defendant-debtor's efforts to evade judgment. Plaintiff Frank Miller, Jr. ("Plaintiff") is a West Virginia resident. (ECF No. 87 at 1, ¶ 1.) In 2016, he purchased a .38 caliber Derringer handgun from Rural King in Cross Lanes, West Virginia. (ECF No. 1 at 4, ¶ 12.) A year later, that handgun inadvertently discharged. (*Id.* at 4–5, ¶ 13.) The round struck Plaintiff in the left calf, upper left thigh, and lower left abdomen. (*Id.*)

Plaintiff filed a products liability suit in this Court on February 6, 2018. (ECF No. 1.) He sued both Cobra Enterprises of Utah, Inc. ("Cobra"), the handgun's manufacturer, and RK Holdings, LLP, the Rural King that sold him the defective gun. (*Id.*) He and Rural King settled

1

out of court.  (ECF Nos. 69 & 70.)  Cobra, however, chose to not defend the suit.  The Court warned Cobra that failure to defend would result in default judgment, but Cobra ignored that warning.  (ECF Nos. 54 & 66.)  The Court then entered default judgment against Cobra, awarding Plaintiff $2,000,000.00 in damages.  (ECF Nos. 66 & 81.)

While this litigation (or lack thereof) was happening, Jared Yeates, Cobra's sole owner, was scheming to protect his assets.  By mid-2018, Cobra's cheap handguns[1] had injured quite a few customers, and Cobra had racked up legal claims against it.  (ECF No. 87-1.)  Mr. Yeates saw the writing on the wall and decided to form a new company—Bearman Industries, LLC, Defendant herein.  (*Id.*)  Cobra then sold Defendant the rights and equipment to manufacture Derringer handguns, all for the handsome sum of $10.00.  (ECF No. 87 at 6, ¶ 24.)  This asset transfer left Cobra insolvent, which all but ensured that Plaintiff could not collect on his judgment.  (*Id.* at 6, ¶ 27(e).)  Then, for good measure, Cobra filed for bankruptcy on February 24, 2020, the very day Plaintiff was entitled to execute his judgment.  (*Id.* at 5, ¶ 20.)

Upon learning of this asset transfer and Cobra's resulting insolvency, Plaintiff moved to reopen the case.  (ECF No. 85.)  The Court granted the motion, and Plaintiff filed an amended complaint against Defendant for fraudulently and, in the alternative, negligently incurring Cobra's assets.  (ECF Nos. 86 & 87.)  Defendant moved to dismiss the amended complaint for lack of personal jurisdiction and failure to state a claim.  (ECF No. 109.)  The Court denied that motion without prejudice and ordered the parties to conduct limited jurisdictional discovery.  (ECF No. 117.)  Once complete, the Court held an evidentiary hearing on the jurisdictional issue.  (ECF No.

---

[1] Defendant's Derringer handguns have sold for as low as $144.44.  (ECF No. 132-7.)

2

134.) The Court then ordered the parties to re-brief the issues. (ECF No. 137 at 26:21–27:14.) The parties have done so, and the matter is now ripe for adjudication. (ECF Nos. 138–141.)

Before turning to the legal analysis, the Court must first discuss what the jurisdictional discovery revealed. Defendant is a Utah limited liability company with its offices and operations in Salt Lake City, Utah. (ECF No. 132-16.) Mr. Yeates, a Utah resident, is the sole member-manager of Defendant. (*Id.*) Defendant's employees also live in Utah, where they manufacture Defendant's firearms. (*Id.*)

Defendant's business model looks something like this: each year, Defendant sends a price list to half a dozen firearm distributors. (ECF No. 132-12 at 2–3.) Those distributors—none of which are in West Virginia—then decide which firearms to order. (*Id.*) Once an order is placed, Defendant fills the order at its Utah facility. (*See id.*) Defendant then ships the completed order to the distributor, who pays Defendant upon receiving the shipment. (*See* ECF No. 132-12 at 8.) Notably, title passes from Defendant to the distributor once the shipment arrives at the distributor's location. (*Id.*) The distributor, after taking title and without Defendant's input, sells these firearms to various retailers throughout the country. (*Id.* at 3–4.) Defendant's distributors periodically provide Defendant with information about these sales, including the retailers' locations. (ECF Nos. 132-4 & 132-5.) Of the retailers that Defendant knows are selling its guns, several are in West Virginia—49 to be exact. (ECF No. 132-1.) However, because Defendant uses middlemen-distributors to market and sell its guns, it does no business in West Virginia. Defendant has never contracted with a West Virginia retailer or customer, nor has Defendant ever advertised here. (ECF No. 132-12 at 3–4.)

Although Defendant structured its business to avoid all contact with consumers, the plan is not bulletproof. Defendant's firearms come under warranty, so when something is amiss with a Bearman gun, the customer contacts Defendant. (ECF No. 132-14 at 48:16–51:18.) Defendant then asks the customer to ship the gun back to Utah. (*Id.*) After the defective gun arrives, Defendant checks whether the gun has been broken, modified, or otherwise altered, which would negate the warranty. (*Id.*) If not, and the gun is still under warranty, Defendant repairs the gun, free of cost, and ships it back to the customer. (*Id.*) West Virginians routinely reach out to Defendant with repair requests: between February 2021, and May 2022, Defendant repaired guns for 13 different West Virginians. (ECF No. 132-8.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) requires the defendant to "affirmatively raise a personal jurisdiction challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). Once the challenge is raised, the plaintiff bears the burden of proving jurisdiction is proper. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005). "The plaintiff's burden in establishing jurisdiction varies according to the posture of a case and the evidence that has been presented to the court." *Grayson*, 816 F.3d at 268. Where, as here, the court has conducted an evidentiary hearing on the jurisdictional issue, the plaintiff must prove jurisdiction by a preponderance of the evidence. *Id.*; *see also Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) ("When personal jurisdiction is properly challenged under Rule 12(b)(2), the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence.").

## III. DISCUSSION

Federal courts apply the forum state's law when determining whether they have personal jurisdiction over a party. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)). This requires the Court to "first consider whether [West Virginia's] long-arm statute authorizes the exercise of jurisdiction over the defendant." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 134 (4th Cir. 1996).[2] If so, the Court must "then determine whether the exercise of jurisdiction comports with the Fourteenth Amendment due process requirements." *Id.*; *see also Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009) ("A federal district court may only exercise personal jurisdiction over a foreign corporation if such jurisdiction is authorized by the long-arm statute of the state in which it sits and application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment.").

*A. West Virginia's long-arm statute authorizes the Court to exercise personal jurisdiction*

West Virginia has two long-arm statutes, West Virginia Code §§ 31D-15-1501(d) and 56-3-33(a), the latter of which is at issue here.[3] Section 56-3-33(a) provides, in pertinent part, that the Court has jurisdiction over any non-resident defendant who

> (1) Transact[s] any business in this state;
>
> (2) Contract[s] to supply services or things in this state;
>
> (3) Caus[es] tortious injury by an act or omission in this state;

---

[2] The parties dispute whether the West Virginia long-arm statute is coextensive with due process, such that the two-step inquiry merges into one. The Court notes that the Fourth Circuit has previously said the two are coextensive, *In re Celotex Corp.*, 124 F.3d 619, 627–28 (4th Cir. 1997), but the West Virginia Supreme Court has recently instructed courts to perform a two-step inquiry. Syl. Pt. 3, *State ex rel. Ford Motor Co. v. McGraw*, 788 S.E.2d 319 (W. Va. 2016). Seeing how this Court is bound by the West Virginia Supreme Court's interpretation of its own long-arm statute, *Hortonville Joint Sch. Dist. No. 1. v. Hortonville Educ. Ass'n*, 426 U.S. 482, 488 (1976), the Court will follow *McGraw* and conduct a two step-injury.

[3] West Virginia Code § 31D-15-1501(d) only "applies to for-profit corporations that are incorporated under a law other than the law of West Virginia." *McGraw*, 788 S.E.2d at 327. Plaintiff has not argued that Defendant—a limited liability company—is covered by section 31D-15-1501(d).

5

> (4) Caus[es] tortious injury in this state by an act or omission outside this state if he or she regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state.

When interpreting this long-arm statute, the Court starts with the text. *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1724 (2020). The "cardinal principle of statutory construction" requires the Court to "first [discern] the [statute's] ordinary or natural meaning." *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 356 (4th Cir. 2020) (internal quotation marks omitted) (quoting *United States v. Mills*, 485 F.3d 219, 222 (4th Cir. 2007)); *see also Hurlburt v. Black*, 925 F.3d 154, 158 (4th Cir. 2019) (explaining that courts "first and foremost strive to implement [legislative] intent by examining the plain language."). When the statute's meaning is clear and unambiguous, the Court's inquiry ends. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).

Here, the statutory text is plain, so the Court need not delve into canons of construction. Defendant argues, and the Court agrees, that none of the first three subsections confer jurisdiction. Subsection (1) plainly requires Defendant to have done business with someone in West Virginia. Defendant, by contrast, sells exclusively to out-of-state distributors. Subsection (2) similarly fails to confer jurisdiction because Defendant has never contracted to supply firearms in West Virginia. Defendant certainly knows that its guns are being sold here, but knowledge is not enough. Instead, the statute requires, in the contract, "an element of purpose before a defendant falls within the [subsection's] reach." *Taylor v. Sethmar Transp., Inc.*, No. 2:19-cv-00770, 2021 WL 4751419, at *6 (S.D. W. Va. Oct. 12, 2021). Defendant's sole goal was to get its firearms to its out-of-state distributors and get paid; Plaintiff has failed to show that Defendant ever contracted for the purpose of supplying firearms to West Virginians. Subsection (3) also fails to confer jurisdiction because

6

Defendant has never been in West Virginia, which precludes a finding that it caused a "tortious injury by an act or omission in" the State. W. Va. Code § 56-3-33(a)(3).

All that being said, the Court cannot ignore obvious: subsection (4) confers jurisdiction over Defendant. A simple parsing of the statutory elements confirms this. First, Defendant has caused a tortious injury in West Virginia—Plaintiff's inability to collect against Cobra. Second, that injury resulted from Defendant tortiously incurring Cobra's assets for the purpose of making Cobra insolvent, an act that likely happened in Utah (or at least not in West Virginia). Third, Defendant derives substantial revenue from the Bearman firearms that are purchased in West Virginia.[4] Defendant's conduct thus checks the three necessary boxes to confer jurisdiction over Defendant.

Satisfied that West Virginia's long-arm statute authorizes jurisdiction here, the Court must now determine whether exercising jurisdiction would comply with due process.

*B. Exercising personal jurisdiction would be inconsistent with Due Process*

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). Put differently, courts may only exercise jurisdiction over a defendant when the defendant "ha[s] certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

---

[4] In May 2021 alone, one of Defendant's distributors sold 51 firearms to West Virginia retailers, accruing $5,343.45 in sales. (ECF Nos. 132-4 & 132-5.)

The Fourth Circuit uses a three-prong test to determine whether a defendant has established minimum contacts with the forum state. First, courts consider "the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 559 (4th Cir. 2014). Second, courts ask "whether the plaintiff's claims [arose] out of those [forum State] activities." *Id.* (first alteration in original). Third, courts determine "whether the exercise of personal jurisdiction is constitutionally reasonable." *Id.* If the plaintiff fails to prove any of these three elements, courts cannot exercise jurisdiction. *Consulting Eng'rs Corp.*, 561 F.3d at 278.

1. Bearman has never purposefully availed itself of West Virginia

The jurisdictional analysis focuses on "the defendant's relationship to the forum State." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017). Jurisdiction is proper only when "the defendant [has] purposefully established 'minimum contacts' in the forum State." *Burger King*, 471 U.S. at 474 (quoting *Int'l Shoe*, 326 U.S. at 316). This requires "the defendant [to] deliberately reach[] out beyond its home," *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (internal quotation marks omitted), and undertake "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Burger King*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Importantly, the unilateral acts of third parties cannot create the minimum contacts necessary for jurisdiction; "the defendant *himself* [must] create a 'substantial connection' with the forum State." *Id.* (emphasis in original).

Here, Defendant has never purposefully availed itself of the privilege of conducting activities in West Virginia. Defendant is a Utah limited liability company that has never sought—

8

much less received—permission to conduct business in West Virginia. Defendant has no members, managers, or employees in the State. Nor does Defendant have any property, offices, or subsidiaries here. Defendant has never advertised in West Virginia. It has never made a single in-state sale. There is simply no evidence that Defendant has "reached out beyond" Utah and "purposefully avail[ed] itself of the privilege of conducting activities" in West Virginia. *Ford Motor*, 141 S. Ct. at 1024–25.

    2.  No part of Defendant's business model amounts to "purposeful availment"

Plaintiff believes otherwise, but his points are meritless. Plaintiff first argues that Defendant purposefully availed itself of West Virginia by placing its firearms in the stream of commerce with the expectation that they will arrive here. (ECF No. 140 at 5–8.) He also argues that Defendant purposefully availed itself of West Virginia by "deliberately reach[ing] out to exploit the West Virginia market." (*Id.* at 6.) The Court addresses each argument in turn.

    a. Stream of Commerce

As noted above, Plaintiff argues that Defendant purposefully availed itself of West Virginia by placing its firearms in the stream of commerce "with the expectation that they will be purchased by [West Virginia] consumers." (*Id.* at 5–8.) Unfortunately for Plaintiff, he misses the mark. The Court first reviews caselaw on the stream-of-commerce theory, and then analyzes Plaintiff's argument.

The Supreme Court first addressed the stream-of-commerce theory in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), where it considered whether courts may exercise jurisdiction over an out-of-state defendant solely because a product it sold wound up in the forum State. There, the defendants were a regional auto distributor and one of its local dealers,

each located in the Northeast, that limited their business to that region. *Id.* at 288–89. In the course of business, the dealer sold a car to the plaintiffs, who were then New York residents. *Id.* at 288. The plaintiffs later left New York, headed for a new home in Arizona, but were involved in a wreck in Oklahoma. *Id.* The plaintiffs filed a products liability suit in Oklahoma against the entire chain of distribution, including the distributor and dealer. *Id.*

The Court held that Oklahoma could not exercise jurisdiction over the two defendants because there was "a total absence of" contacts between them and Oklahoma. *Id.* at 295. Indeed, the defendants "carr[ied] on no activity whatsoever in Oklahoma," nor did they try "to serve the Oklahoma market" in any way. *Id.* The Court further rejected the idea that jurisdiction was proper because the plaintiff's car "would [foreseeably] cause injury in Oklahoma." *Id.* "'[F]oreseeability' alone," the Court explained, "has never been a sufficient benchmark" for the jurisdictional inquiry. *Id.* If that were so, "[e]very seller of chattels would in effect appoint the chattel his agent for service of process," and "[h]is amenability to suit would travel with the chattel." *Id.* at 296.

However, the Court disclaimed the idea "that foreseeability is wholly irrelevant." *Id.* at 297. "[T]he foreseeability that is critical to [the] due process analysis is not the mere likelihood that a product will find its way into the forum State." *Id.* "Rather . . . the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *Id.* The Court said, for instance, that due process would allow a forum State to exercise "jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 297–98.

*World-Wide Volkswagen*'s *dicta* on foreseeability—and the stream-of-commerce theory in particular—caused a split among the lower courts. *Asahi Metal Indus. Co. v. Superior Ct. of Cal.,*

10

*Solano Cnty.*, 480 U.S. 102, 110 (1987) (plurality opinion). Some courts believed that the mere "act of placing the product in the stream of commerce," knowing it would be swept into the forum State, was sufficient to satisfy due process. *Id.* Others imposed a heightened standard, "requir[ing] the action of the defendant to be more purposefully directed at the forum State than the mere act of placing a product in the stream of commerce." *Id.*

The Court tried to resolve this split in *Asahi* but neither view garnered five votes. *Asahi* involved another products liability suit, this time arising from a tire blowout. *Id.* at 105–06. The California plaintiff sued a Taiwanese tube maker, who in turn sought indemnification from a Japanese valve assembly manufacturer. *Id.* at 106. The latter manufactured its valve assemblies in Japan before selling them to the former in Taiwan. *Id.* From there, the valve assemblies were incorporated in the tubes, and the finished product was shipped around the world, including California. *Id.* When served with the California summons, the Japanese valve assembly manufacturer moved to quash, arguing that it lacked minimum contacts with the forum State. *See id.*

The stream-of-commerce issue evenly divided the Court. Justice O'Connor, joined by three others, thought that due process required more than simply placing a product in the stream of commerce, knowing it would be swept into the forum State. *Id.* at 112 (O'Connor, J.). She explained that "[t]he 'substantial connection' between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State.*" *Id.* (emphasis in original) (internal citation omitted). Since "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State," she said it cannot form the basis for

11

jurisdiction. *Id.* Justice Brennan, himself joined by three justices, disagreed. In his view, "[t]he stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale." *Id.* at 117 (Brennan, J.). He reasoned that placing a product into this steady stream is a deliberate act whereby the upstream seller seeks to serve, and enjoy the laws of, the downstream forum State. *Id.* Justice Brennan further explained that "[t]hese [commercial] benefits accrue regardless of whether that [upstream seller] directly conducts business in the forum State, or engages in additional conduct directed toward that State." *Id.* Because of this, he would have adopted the simple stream-of-commerce theory.[5] *Id.*

In the end, however, the stream-of-commerce issue was not dispositive. An eight-Justice majority agreed that forcing the Japanese valve assembly manufacturer to litigate its indemnity dispute with a Taiwanese company in California would be constitutionally unreasonable, given the international context and California's marginal interest in the litigation. *Id.* at 114. Thus, the stream-of-commerce theory's exact requirements remained an open question following *Asahi*.

The Fourth Circuit staked out its position in *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939 (4th Cir. 1994), where it adopted Justice O'Connor's approach. Hollingsworth & Vose Co. ("HVC") was a Massachusetts-based company that manufactured cigarette filter material, which contained asbestos. *Id.* at 940. HVC sold the asbestos-containing filter material to Lorillard, a cigarette manufacturer, whose factories were in New Jersey and Kentucky. *Id.* Once sold, Lorillard incorporated the HVC material into its cigarettes and, from there, sold them in Maryland

---

[5] Justice Stevens declined to wade into the stream-of-commerce debate. He believed deciding that issue was unnecessary for the Court's decision because, no matter the outcome, "exercis[ing] . . . jurisdiction over [the Japanese valve assembly manufacturer] in this case would be 'unreasonable and unfair.'" *Asahi*, 480 U.S. at 121 (Stevens, J.).

12

where they were consumed by, among others, Stanley Lesnick. *Id.* Smoking these asbestos-containing cigarettes caused Mr. Lesnick to develop mesothelioma, a form of lung cancer. *Id.* The cancer prevailed, and his widow filed a products liability suit against HVC and Lorillard in Maryland. *Id.* HVC moved to dismiss for lack of personal jurisdiction. *Id.* It argued that, under *Asahi*, "plac[ing] [its filter] material in commerce knowing that it would eventually be sold in Maryland" was insufficient, and that it had never "purposefully directed [activity] toward Maryland." *Id.* at 940–41. Thus, HCV argued, Maryland did not have jurisdiction over it. *Id.*

The Fourth Circuit agreed. It first reviewed *World-Wide Volkswagen* and *Asahi*, and then concluded that neither opinion "abandoned the" requirement "that an out-of-state [defendant] have engaged in some activity purposefully directed toward the forum [S]tate." *Id.* at 945. Because of this, the Fourth Circuit rejected Mrs. Lesnick's argument that "*World–Wide Volkswagen* 's holding is . . . so broad as" to allow placing a product in the stream of commerce, expecting it to arrive in the forum State, "to establish jurisdiction." *Id.* at 946. Thus, in the Fourth Circuit, plaintiffs relying on a stream-of-commerce theory must prove additional "purposeful activity on the part of the defendant[] [that] establish[es] a meaningful contact with the forum [S]tate." *Id.* at 944.

Now returning to Plaintiff's stream-of-commerce argument, he relies exclusively on *World-Wide Volkswagen*. (ECF No. 140 at 4–8.) Specifically, he argues that Defendant placed its firearms in the stream of commerce, knowing they would be sold in West Virginia. (*Id.*) This, he believes, satisfies the purposeful availment requirement. (*Id.*)

Plaintiff's argument is directly at odds with *Lesnick* and the law of this Circuit. The *Lesnick* Court, unlike Plaintiff here, "read [*World-Wide Volkswagen*] much narrower," and held that it did not displace "[t]he touchstone of the minimum contacts analysis" that the defendant "have engaged

13

in some activity purposefully directed toward the forum [S]tate." *Lesnick*, 35 F.3d at 944–45. This Court is bound by that holding. Thus, Defendant's selling of its firearms, knowing they will end up in West Virginia, without more, is insufficient to confer jurisdiction.

b. Market Exploitation

Plaintiff next argues that Defendant purposefully availed itself of West Virginia by "deliberately reach[ing] out to exploit the West Virginia [firearm] market." (ECF No. 140 at 6.)

In *Ford Motor*, the Supreme Court explained that a defendant purposefully avails itself of a State by "continuously and deliberately exploit[ing] [the State's] market." 141 S. Ct. at 1027. Ford, a global auto manufacturer, exploited the forum States' markets[6] by establishing sprawling business networks in each State. *Id.* at 1022–23. Ford advertised "[b]y every means imaginable— among them, billboards, TV and radio spots, print ads, and direct mail." *Id.* at 1028. Ford also had dozens of dealerships selling its cars. *Id.* Those same dealerships "regularly maintain[ed] and repair[ed] Ford cars," even "those whose warranties ha[d] long since expired." *Id.* If a customer needed a replacement part, they were in luck—Ford regularly distributed parts across each State. *Id.* All these in-state activities "ma[de] it easier to own a Ford," which inevitably "ma[de] Ford money." *Id.* This led the Court to find that "Ford had systematically served [or exploited the auto] market in" the forum States, and thus purposefully availed itself of them. *Id.*

Here, no matter how hard Plaintiff tries to shoehorn facts to make it look like Defendant has exploited the West Virginia gun market, the Court cannot agree. For one thing, Defendant has never advertised in West Virginia. Plaintiff, however, says otherwise. He relies on two emails that he believes show Defendant exploited the West Virginia market by "offer[ing] free gun

---

[6] *Ford Motor* involved consolidated personal injury cases from Minnesota and Montana state courts. 141 S. Ct. at 1023.

14

promotions to West Virginia retailers." (ECF No. 140 at 8.) Neither email supports this. The first email is between Defendant and an out-of-state distributor (not a West Virginia retailer), and it discusses the two possibly running a future promotion. (*See* ECF No. 132-6.) The Court sees nothing here but corporate brainstorming. A West Virginia Rural King sent Plaintiff the second email, which advertised a deal on Bearman guns. (ECF No. 132-7.) Plaintiff believes this was "a direct result" of Defendant's (possible) promotion. (ECF No. 140 at 8.) Putting aside the fact that Plaintiff has no evidence that Defendant's promotion ever occurred, he also ignores basic cause and effect. Rural King sent this email to Plaintiff nearly three months *prior to* Defendant toying with the promotional idea. Unless Rural King's marketing department is clairvoyant, the Court sees no way that Defendant's conduct could have caused Rural King's advertisement.

For another, Defendant repairing West Virginians' guns at their request is not an "action[] by the defendant [itself] that create[s] a 'substantial connection' with the forum State." *Burger King*, 471 U.S. at 475. The Fourth Circuit has addressed similar situations before, where an in-state resident initiated contact with the out-of-state defendant; each time, the Court rejected the idea that these contacts create a substantial connection with the forum State. *Universal Leather, LLC*, 773 F.3d at 562; *Autoscribe Corp. v. Goldman and Steinberg*, No. 94-1749, 1995 WL 56662, at *6 (4th Cir. 1995) (per curiam); *Fed. Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 658 (4th Cir. 1989). Defendant's repair program is no different. Whenever a Bearman gun malfunctions, the customer must initiate contact with Defendant before Defendant will consider repairing their gun. Since customer-initiated contact "do[es] not evidence purposeful activity by [Defendant] toward the State of [West Virginia]," *Autoscribe Corp.*, 1995 WL 56662, at *6 (citing *Hanson*, 357 U.S. at 253), the Court cannot conclude that Defendant's repair program constitutes market

exploitation. This conclusion is consistent with *Ford Motor*. Ford exploited the States' auto markets by saturating each with replacement parts, continually servicing Ford cars—at forum State dealerships—whose warranties had long since expired. *Ford Motor*, 141 S. Ct. at 1028. Defendant, by contrast, has not flooded West Virginia with replacement parts, nor does it repair guns that are out-of-warranty. Even when Defendant does repair a customer's gun, it does so in Utah, not West Virginia. The Court cannot conclude, on these facts, that Defendant has "deliberately 'reached out beyond'" Utah and "exploi[ted] [the West Virginia firearm] market." *Ford Motor*, 141 S. Ct. at 1025 (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)).

In the end, Plaintiff has no evidence that Defendant ever set its sights on West Virginia and purposefully availed itself of the State. The Court thus ends its inquiry here. *Consulting Eng'rs Corp.,* 561 F.3d at 278 (explaining that "[i]f, and only if, [the Court] find[s] that the plaintiff has satisfied th[e] first prong of the test for specific jurisdiction need [the Court] move on to a consideration of prongs two and three.").

## IV. CONCLUSION

For these reasons, the Court cannot force Defendant to litigate in West Virginia. Accordingly, it is **ORDERED** that this civil action is **DISMISSED WITHOUT PREJUDICE** and retired from the docket of this Court. The Court **DIRECTS** the Clerk to remove this matter from the Court's docket.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: March 22, 2023

16

_____
THOMAS E. JOHNSTON, CHIEF JUDGE

17